1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**          )
                                           )
6              **PLAINTIFF,**              )      CASE NO.
                                           )
7              **vs.**                     )      CR 20-35-JFW
                                           )
8   **MITCHELL ENGLANDER,**                )
                                           )      **PAGES 1 TO 72**
9              **DEFENDANT.**              )
    _____       )

10

11

12

13                  **REPORTER'S TRANSCRIPT OF**
                      **SENTENCING VIA ZOOM**
14               **MONDAY, JANUARY 25, 2021**
                         **8:08 A.M.**
15               **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22
    _____
23
                **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
24              FEDERAL OFFICIAL COURT REPORTER
                350 WEST 1ST STREET, SUITE 4455
25              LOS ANGELES, CALIFORNIA 90012
                    MIRANDAALGORRI@GMAIL.COM

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

    NICOLA T. HANNA
    UNITED STATES ATTORNEY
    BY:  MACK JENKINS
    BY:  VERONICA DRAGALIN
    BY:  MELISSA MILLS
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


**FOR THE DEFENDANT:**

    KENDALL BRILL & KELLY, LLP
    BY:  JANET I. LEVINE
    BY:  SARAH EMILY MOSES
    10100 Santa Monica Boulevard
    Suite 1725
    Los Angeles, California 90067

1          **LOS ANGELES, CALIFORNIA; MONDAY, JANUARY 25, 2021**

2                          **8:08 A.M.**

3                            **---**

4

5          THE CLERK:  Calling item 1, CR 20-35-JFW,

6    United States of America versus Mitchell Englander.

7          Counsel, please state your appearances.

8          MR. JENKINS:  Good morning, Your Honor.

9          Mack Jenkins on behalf of the United States.

10   Joining me socially distanced in the conference room is

11   AUSA Veronica Dragalin, AUSA Melissa Mills, and special agent

12   of the FBI Andrew Civetti.

13         MS. LEVINE:  Good morning, Your Honor.

14         Janet Levine and Sarah Moses together with

15   Mitchell Englander, Your Honor.  We're in the conference room

16   as well.  I have a mask on as do they.  If the Court can't hear

17   me at any time or needs me to take it off, please let me know.

18         THE COURT:  All right.  I can tell you that the

19   sound quality is very good for both Mr. Jenkins and for you,

20   but I will let you know if the quality deteriorates in any

21   fashion during the course of the hearing.

22         MS. LEVINE:  Thank you, Your Honor.

23         THE COURT:  All right.  This matter is before the

24   Court for pronouncement of judgment and imposition of sentence.

25   The defendant has consented to proceed by video.  That consent

1   was filed on January 12 of 2021 and appears as docket No. 55.

2   The Court has made the required CARES Act findings in

3   docket No. 56.

4              So let me ask counsel is there any reason why

5   judgment and sentence should not be imposed at this time?

6              MS. LEVINE:  No, Your Honor.

7              If I might inquire of the Court, this is the

8   first time I have done a Zoom sentencing, and my natural

9   inclination is to rise when I address the Court, but I haven't

10  yet, and I don't know what the Court's preference is on that.

11             THE COURT:  You don't need to rise.  You may

12  remain seated.

13             MS. LEVINE:  Thank you, Your Honor.

14             THE COURT:  All right.  So the answer to my

15  question is there is no reason why judgment and sentence should

16  not be imposed?

17             MS. LEVINE:  That is correct, Your Honor.  No

18  reason.

19             THE COURT:  From the Government?

20             MR. JENKINS:  That is correct, Your Honor.  I

21  agree.

22             THE COURT:  All right.  Counsel for the

23  defendant, did you and your client read and discuss the

24  presentence report and the addendum to the presentence report?

25             MS. LEVINE:  Yes, Your Honor.

1              THE COURT:  All right.  Although the

2    United States Sentencing Guidelines are now advisory, the Court

3    must still consider the advisory guideline range in addition to

4    the other directives set forth in Section 3553(a) and impose a

5    sentence that is sufficient but not greater than necessary to

6    comply with the purposes of the act.

7              As counsel know, this Court follows a two-step or

8    a two-phase sentencing process.  In phase one I will determine

9    or calculate the applicable advisory guideline range which will

10   require the Court to resolve any objections to the presentence

11   report guideline calculations as well as any factual disputes.

12   Thereafter, I will determine whether, pursuant to the

13   Sentencing Commission Policy Statements, any departures from

14   the advisory guideline range clearly apply.

15             In this case on July 7 of 2020, the defendant

16   entered a plea of guilty to Count 1 of the Indictment that was

17   filed in January of 2020.  The plea was entered pursuant to a

18   plea agreement filed on March 27 which appears as

19   docket No. 24.  On December 21st, the probation officer filed a

20   presentence report and a recommendation letter.  Those appear

21   as docket Nos. 39 and 40.  On January 15 of 2021, the probation

22   officer filed an addendum which appears as docket No. 57.

23             The probation officer has made the following

24   guideline calculations pursuant to the presentence report which

25   is docket No. 40.  The probation officer has calculated the

1   base offense level at level 6.  To that the probation officer

2   has reduced by two levels for the defendant's acceptance of

3   responsibility.  The result is a total offense level of 4.  The

4   defendant is placed in criminal history category one.  The

5   resulting advisory guideline range is zero to six months.

6            The parties have filed their sentencing papers as

7   follows: On January 4, 2021, the Government filed its

8   objections to the presentence report which appear as

9   docket No. 41.  The Government filed its sentencing position

10  paper on January 11.  It appears as docket No. 49.  And the

11  Government raises several issues with respect to the probation

12  officer's calculation of the advisory guideline range.

13           On January 11, the defendant filed his position

14  regarding sentencing which appears as docket No. 51.  Defendant

15  also filed a response to the Government's objections to the

16  presentence report which appears as docket No. 48, and then the

17  defendant filed a reply on January 19 which appears as

18  docket No. 58.

19           The defendant agrees with the probation officer's

20  calculation of the advisory guideline range and opposes the

21  Government's request for the enhancements and its argument in

22  support or against the calculation of the base offense level.

23           The Government raises several issues with respect

24  to the probation officer's calculation of the guidelines, the

25  first of which is the Government argues that the base offense

1   level of 6 was incorrectly calculated by the probation officer

2   and that, pursuant to the cross-reference provisions of

3   2B1.1(c)(3), the obstruction guideline 2J1.2 applies and the

4   result is that the base offense level should be 14 and not 6.

5            The Government also requests the Court to add a

6   two-level enhancement for the extensive scope under

7   2J1.2(b)(3)(C), and the third issue is a two-level enhancement

8   for abuse of the public trust pursuant to 3B1.3.

9            The result of the Government's guideline

10  calculation is a total offense level of 15 and a range of 18 to

11  24 months.

12           So those are the issues that the Court must

13  resolve in phase one, and I will hear argument on each of those

14  issues.  But please keep in mind that I have reviewed all of

15  the papers, and if you have anything that you wish to add to

16  your papers, I will certainly hear from you.  But I don't want

17  you to simply rehash the arguments already made.

18           So the first issue and the main issue in phase

19  one that the Court must resolve is the -- whether or not the

20  probation officer correctly calculated the base offense level

21  at 6 rather than using the cross-referencing provisions of

22  2B1.1(c)(3) and applying the base level of 14 rather than 6.

23           My tentative ruling with respect to that issue is

24  that the Court finds that defendant's conduct described in

25  Count 1 of the Indictment establishes each of the elements of

1   the violation of Section 1512(b)(3) and the evidence and the

2   factual basis for the defendant's plea of guilty supports the

3   application of 2J1.2(a) to the cross-referencing provisions of

4   2B1.1(c)(3).

5             So in light of the Court's tentative ruling, I

6   will hear from Ms. Levine, and I will hear from the Government

7   if it wishes to argue after Ms. Levine argues.

8             MS. LEVINE:  Thank you, Your Honor.

9             THE COURT:  What I'm going to do is rule on each

10  one of these issues in phase one separately.  So the first

11  issue is the base offense level.

12            MS. LEVINE:  Your Honor, I would obviously object

13  to the Court's finding otherwise from what the probation report

14  suggested.  We have a plea agreement in this case, Your Honor,

15  and the plea agreement is to 1001 false statement violation and

16  a carefully crafted factual statement attached thereto drafted

17  by the Government, signed by the parties, read by the

18  Government at the time of the plea along with the elements of

19  the offense.  The elements of the offense that were read were

20  the elements of a 1001 offense, not the elements of a 1512

21  offense.

22            And the elements are quite different, Your Honor.

23  1001 offense which carries five years, a much shorter sentence

24  than the 1512 offense that carries 20 years talks about making

25  a material false statement read very broadly by cases.  1512 is

1    very different.  It focuses on interfering with a federal

2    offense.

3              What's important in this case, Your Honor, is

4    what the false statements were about.  From June 1 to

5    June 12, 2017, Mitch Englander had a relationship with

6    Businessman A that took place at two different casinos.  That

7    wasn't a crime, and nothing that occurred there was a federal

8    crime.  The Government has not said it was a federal crime.

9    The Government has not charged any federal crime.

10             What it was was the basis, Your Honor, for the

11   false statements.  It was what Mitchell Englander wanted to

12   avoid talking about in the false statement.  And that was the

13   subject of the false statement.  So when Mitch Englander met

14   with the Government on the three occasions, a single proffer, a

15   single prosecutor, a single case agent, a single agreement, the

16   focus was on these events that occurred that were not federal

17   offenses.  The discussion was about those events, and the

18   discussion was about Mr. Englander's relationship with

19   Businessman A.

20             The relationship with Businessman A was carefully

21   coordinated by the Government.  Before Mr. Englander's first

22   meeting with the Government, Businessman A at the direction of

23   the Government met with Mr. Englander.  Before the second

24   meeting, same thing.  Before the third meeting, same thing.

25   And the discussion was not about a federal offense because

1    Mr. Englander had no information about a federal offense.  He

2    wasn't involved in any bribery, no quid pro quo.  The payment

3    of money didn't involve a quid pro quo.  If it had been a

4    federal bribery crime, you can be sure that Mr. Jenkins and the

5    other assistants in this matter would have charged it.

6              In 2017 before this case was filed, before it

7    even had the substantive offense occurring, the

8    Attorney General of the United States directed the prosecutors

9    to charge and pursue the most serious crime, the crime with the

10   most serious offenses.  Here the Government did not pursue the

11   1512, and they didn't pursue it because they didn't have facts

12   to support it.  And there are no facts that support the

13   underlying federal offense that is a requisite element to the

14   1512 offense.

15             Other cases in this district, which surprisingly

16   the Government cites, the *Dredd* case and the *Baca* case support

17   that the 2B1.1 guideline, not the 2J guideline, applies.  The

18   Government cites to the *Dredd* case which is a case that was

19   prosecuted a few years ago.  In that case, involving a false

20   report and false statement in a huge civil rights violation

21   case, at the end of the case -- at the end of the trial, the 2B

22   guideline was applied and it was urged to be applied by the

23   prosecutors involved in this case.  The same with the *Baca*

24   case.  At the time of the original plea, the offer by the

25   Government -- and they cite to this case -- was for a 2B1.1

1    violation, a false statement.

2              In other cases done by the department recently,

3    the Department of Justice support that as well.  We cite them

4    in our papers, Your Honor.  The *Flynn* case and the related

5    cases.  Those are all 2B1.1 false statement cases.

6              Just because the Government charges the witness

7    tampering charge, they didn't pursue it, and they didn't prove

8    it.  And, Your Honor, it's their burden to prove.  And when

9    you're switching, when you're enhancing this much changing from

10   an underlying base offense that usually applies, this

11   offense -- I would submit to the *Valle* case from the

12   9th Circuit 2019 suggests that the Government has the burden of

13   proof by clear and convincing evidence.  It certainly does on

14   enhancements, and there's every reason to treat this like an

15   enhancement because it is an absolute change or enhancement in

16   what would be the presumptive base offense level for this

17   offense.

18             The Government hasn't done that, Your Honor.  And

19   having failed to do that, the probation office got it right.

20   There are no facts to show this stipulation.

21             The other case cited by the Government,

22   *Gutierrez Sanchez* on which they rely so heavily, the

23   9th Circuit case, in the plea agreement every element of the

24   offense existed.  Here are the key last elements which is the

25   difference between 1512 and, for example, some of the other

```
1    obstruction offenses in the 1500 range.  It must relate to a
2    possible or actual federal offense.  Not an offense period.
3    It's not like RICO where a state offense can substitute for or
4    an investigation can substitute for.  It must be an offense.
5    And that is missing here, Your Honor.
6              THE COURT:  All right.  I will hear -- if the
7    Government wishes to argue, I will hear from you briefly.
8              MR. JENKINS:  Yes, Your Honor.  First, number
9    one, this is not a false statement guilty plea.  It is a scheme
10   to falsify material facts which is Count 1 which is different
11   than a substantive false statement case.  That is repeated
12   error in the defense's arguments.
13             Why that is important, Your Honor, is because in
14   Count 1, the count which defendant is pleading guilty, it
15   incorporates every single alleged overt act that is relevant to
16   the obstruction.  It includes everything.  He admitted
17   everything.  If defendant were offered a plea agreement to all
18   seven counts, the factual basis would have been exactly the
19   same as it was presented here, and he would have been guilty of
20   all seven counts.
21             It's made clear by page 9 of Count 1 which says
22   he engaged in a campaign to conduct obstruction and witness
23   tampering in the following manner that lists several overt
24   acts.  That's paragraph 31 of the Indictment of Count 1 which
25   is the count to which defendant pled guilty.
```

1          Related to the federal investigation, it says

2    that defendant's own factual basis, paragraph 1, that the

3    Government was conducting a federal investigation into public

4    corruption.  So the fact that they're arguing now that there

5    was no such investigation is, in fact, walking back or

6    disputing the factual basis.

7          My last point, we would ask the Court to find

8    beyond a reasonable doubt that we have met these elements

9    because they come precisely from the defendant's own sworn

10   admissions.  So if the Court would like to elevate that

11   standard of proof, we believe it is met by the defendant's

12   sworn admissions, Your Honor.

13          We would submit.

14          MS. LEVINE:  If I might reply briefly.

15          THE COURT:  Sure.

16          MS. LEVINE:  What is key about Mr. Jenkins's

17   argument, Your Honor, is he says, yes, Mr. Englander admits

18   they were conducting a federal investigation, and we don't deny

19   that, Your Honor.  The question is whether his obstruction

20   alleged by the Government now went to a federal offense, and

21   that's not what's alleged.  The statements here did not relate

22   to the false statements, even the discussions that false

23   statements do not relate to a federal offense.

24          So when carefully drafting this statute, the

25   legislators did not put in federal investigation as they did in

1    1510 I believe it is.  They put in federal offense.  And it's

2    that piece that Mr. Jenkins lours over, Your Honor, but it is

3    critical, and that is the piece that is missing here.

4                  THE COURT:  All right.  The Court makes the

5    following ruling on the base offense level issue:

6                  Section 2B1.1(c)(3) provides as follows -- and I

7    am quoting -- "If, A, neither subdivision (1) nor (2) of this

8    subsection applies; B, the defendant was convicted under a

9    statute prescribing false, fictitious, or fraudulent statements

10   or representations generally and sets examples of 1001, 1341,

11   1342, or 1343; and, C, the conduct set forth in the count of

12   conviction establishes an offense specifically covered by

13   another guideline in Chapter 2 apply that other guideline."

14                  It is undisputed that the defendant's count of

15   conviction for violation of 18 United States Code

16   Section 1001(a) meets the requirements of A and B of the

17   cross-referencing provisions.  The parties disagree over

18   whether the third requirement is met, whether the conduct set

19   forth in the count of conviction establishes an offense

20   specifically covered by another guideline in Chapter 2, in this

21   case witness tampering under 18 United States Code

22   Section 1512(b)(3) which is governed by guideline

23   Section 2J1.2.

24                  The Government argues and the Court agrees that

25   the conduct set forth in the count of conviction establishes

1    the elements of witness tampering under Section 1512(b)(3).

2              As held in *United States versus Wang* at

3    944 F.3d 1081 and *United States versus Genao* at 343 F.3d 578,

4    in order to apply the cross-referencing provision under

5    2B1.1(c)(3), Count 1 of the Indictment must allege elements of

6    witness tampering under Section 1512(b)(3), and those elements

7    must be proven at least by a preponderance of the evidence.

8              Section 1512(b)(3) provides in relevant part --

9    and I'm quoting -- "Whoever knowingly uses intimidation,

10   threats, or corruptly persuades another person or attempts to

11   do so or engages in misleading conduct toward another person

12   with the intent to hinder, delay, or prevent the communication

13   to a law enforcement officer of information relating to the

14   commission or possible commission of a federal offense shall be

15   fined under this title and imprisoned for not more than

16   20 years or both."  That is the end of the quote.

17             Accordingly, as relevant here, the elements of

18   witness tampering under 1512(b)(3) are, one, defendant

19   knowingly corruptly persuades or attempts to corruptly persuade

20   another person; two, with the intent to prevent a communication

21   to a federal law enforcement officer; and, three, relating to

22   the commission of a possible -- relating to the commission or

23   possible commission of a federal offense.

24             The Court concludes that each of these elements

25   is established by the conduct alleged in the count of

1    conviction.

2              With respect to element one, that the defendant

3    knowingly corruptly persuaded or attempted to corruptly

4    persuade another person, Count 1 alleges the defendant had

5    counseled Businessman A to lie and mislead the FBI and the

6    U.S. Attorney's Office at paragraph 30(c) and alleges specific

7    conduct supporting the statement at paragraphs 31(i), (n), and

8    (o).

9              Notably in United States versus -- and I will

10   spell the last name of the case -- K-h-a-t-m-i, 280 F.3d 907,

11   which is the 9th Circuit case, the 9th Circuit concluded the

12   term "corruptly persuades" includes noncoercive attempts to

13   persuade witnesses to lie to investigators.  Moreover, Count 1

14   alleges that this conduct was done knowingly.  Specifically

15   Count 1 at page -- at paragraph 30 alleges defendant knowingly

16   and willfully falsified, concealed, and covered up by trick,

17   scheme, and device material facts and at paragraph 31 alleges

18   defendant carried out the scheme by conducting an obstruction

19   and witness tampering campaign.

20             With respect to element two that the defendant

21   acted with the intent to prevent communication to federal law

22   enforcement officers, Count 1 of the Indictment specifically

23   alleges that, one, defendant knowingly and willfully falsified,

24   concealed, and covered up by trick, scheme, and device material

25   facts which is alleged in paragraph 30; that defendant carried

out the scheme by conducting an obstruction and witness

tampering campaign after learning about the federal

investigation which is alleged in paragraph 31(a); and, three,

defendant repeatedly counseled Businessman A to lie and mislead

the FBI and U.S. Attorney's Office which is contained in the

allegations at paragraphs 30(c), 31(i), 31(m), and 31(o).

Finally, with respect to element 3, the conduct

alleged in Count 1 of the Indictment clearly establishes that

the information of defendant -- defendant intended to prevent

Businessman A from communicating to the FBI and U.S. Attorney's

Office related to the commission or possible commission of a

federal offense.  Indeed, Count 1 specifically alleges that

defendant intended to conceal or cover up that defendant had

accepted from Businessperson A items of value such as cash

payments, escort services, hotel rooms, luxury outings, and

expensive meals.  Defendant attempted to coordinate statements

he made to the FBI and U.S. Attorney's Office with

Businessman A, and defendant had counseled Businessman A to lie

and mislead the FBI and the U.S. Attorney's Office as alleged

in paragraph 30.

These statements relate to the federal

investigation of the potentially illegal pay-to-play scheme

alleged in the Indictment.

Specifically Count 1 of the Indictment alleges

that the defendant conducted the obstruction and witness

1  tampering campaign after learning about the federal

2  investigation.  The term "federal investigation" is defined in

3  paragraph 1 of the introductory allegations of the Indictment.

4  The Court notes that the introductory allegations, paragraphs 1

5  through 29 of the Indictment, are expressly incorporated into

6  each count of the Indictment by paragraph 29.  Paragraph 1 of

7  the Indictment alleges the following:

8              The Federal Bureau of Investigation in

9  Los Angeles and the United States Attorney's Office for the

10  Central District of California were conducting a federal

11  criminal investigation into public corruption throughout the

12  City of Los Angeles related to multiple suspected pay-to-play

13  schemes.  And that was defined as a defined term "the federal

14  investigation."  The federal investigation involved multiple

15  city officials, developers and investors, consultants,

16  lobbyists, and other close associates working in furtherance of

17  the potentially illegal scheme.

18              Paragraph 25 in the introductory allegations of

19  the Indictment further alleges that the FBI and U.S. Attorney's

20  Office began specifically investigating whether

21  Businessperson A had provided personal benefits to the

22  defendant, City Staffer A, Council Member A, or City Staffer B

23  and whether those public officials including the defendant had

24  accepted such personal benefits.

25              Defendant argues that the information he sought

1    to prevent Businessman A from communicating to the FBI and

2    U.S. Attorney's Office as alleged in Count 1 of the Indictment

3    does not relate to a federal offense.  In other words,

4    defendant argues that his acceptance of items of value such as

5    cash payments, escort services, hotels rooms, luxury outings,

6    expensive meals does not by itself constitute a federal

7    offense.

8                Defendant however attempts to read a word out of

9    the witness tampering statute.  The statute expressly provides

10   that the information may relate to the possible commission of a

11   federal offense.  As the district court in Kansas in

12   *United States versus Milton* at 966 F.2d 1038 held, the

13   Government does not have to establish a reasonable basis for

14   the federal investigation before invoking Section 1512.

15   Rather, the Government must prove only that the communication

16   affected related to the possible commission of a federal

17   offense.

18                In this case the Court concludes that the

19   information defendant sought to prevent Businessman A from

20   communicating to the FBI and U.S. Attorney's Office related to

21   the possible commission of a federal offense, namely, for

22   example, pay-to-play scheme in violation of Title 18

23   Section 666.

24                Accordingly, the Court concludes that the conduct

25   set forth in the count of conviction establishes the elements

1   of witness tampering under 1512(b)(3).

2           That is not the end of the inquiry, however.  The

3   Court must also find that each of the elements have been met at

4   least by a preponderance of the evidence.  In this case the

5   Court concludes the factual basis to which defendant stipulated

6   in his plea agreement clearly establishes that defendant

7   committed the offense of witness tampering under 1512(b)(3).

8           With respect to element No. 1, that the defendant

9   knowingly, corruptly persuaded or attempted to corruptly

10  persuade another person, defendant admitted in the factual

11  basis that he repeatedly attempted to corruptly persuade

12  Businessperson A by encouraging him to lie and withhold

13  information from the FBI.  Specifically, at paragraph 8, the

14  defendant admits that he had counseled Businessman A how to lie

15  and mislead the FBI and U.S. Attorney's Office.  At

16  paragraph 17 defendant admits that he told Businessperson A how

17  to answer certain questions from the FBI.  At paragraph 21

18  defendant admits that he told Businessman A what questions the

19  FBI would ask Businessperson A and how to answer them, not to

20  disclose their use with Confide and not to disclose their

21  conversations of the fundraiser.  Finally, at paragraph 23

22  defendant admits that he agreed that Businessperson A should

23  omit that they talked about the content of their FBI

24  interviews.

25          With respect to element two, defendant acted with

1    the intent to prevent communications to a federal law

2    enforcement officer, defendant admitted at paragraph 8 of the

3    factual basis that he knowingly and willfully falsified,

4    concealed, and covered up by trick, scheme, and device material

5    facts.  He also admitted that he carried out the scheme by

6    counseling Businessperson A to lie or not tell the FBI certain

7    information.

8            For example, defendant admitted at paragraph 17

9    that he told Businessperson A not to tell the FBI anything

10   about Businessperson A providing escort services or massage

11   ladies to defendant.  At paragraph 21(d) defendant admitted

12   that he repeatedly told Businessperson A how to respond to the

13   FBI's questions about the use of escorts during the 2017

14   Las Vegas -- June 2017 Las Vegas trip.  And at paragraph 24(d)

15   defendant admitted he repeatedly agreed that Businessman A

16   should omit certain information.

17           These admissions establish defendant acted with

18   the intent to prevent communications to a federal law

19   enforcement officer under Section 1512(b)(3).

20           Finally, with respect to element three, that the

21   information that the defendant intended to prevent

22   Businessman A from communicating to the FBI and U.S. Attorney's

23   Office related to the commission or possible commission of a

24   federal offense.  Defendant admitted that there was a federal

25   criminal investigation into public corruption related to

1   pay-to-play schemes in paragraph 1, that the federal

2   investigation involved multiple city officials, developers,

3   investors, consultants, lobbyists, and other close associates

4   working in furtherance of the potentially illegal scheme which

5   is also alleged in paragraph 1, that he knowingly and willfully

6   falsified, concealed and covered up material facts including

7   that he had accepted from Businessperson A items of value which

8   is alleged in paragraph 8, and that he carried out the scheme

9   after learning about the federal allegation as alleged in

10  paragraph 9.

11          Moreover, as previously discussed, the defendant

12  admitted, for example, that he told Businessperson A not to

13  tell the FBI anything about providing escort services or

14  massage ladies to the defendant, that he repeatedly told

15  Businessperson A how to respond to FBI questions about the use

16  of escorts during the Las Vegas trip at paragraph 21(d).  Such

17  information was clearly related to the pay-to-play scheme

18  investigation which defendant was aware.

19          As discussed already, all that is required is

20  that the information related to a possible commission of a

21  federal offense.  In this case the Court easily concludes that

22  the pay-to-play scheme being investigated by the FBI and the

23  U.S. Attorney's Office was a possible federal offense.

24          Based on the foregoing the Court concludes that

25  the factual basis to which the defendant stipulated in his plea

agreement clearly establishes each of the elements of witness
tampering under 1512(b)(3).  Accordingly, because all of the
requirements to apply the cross-referencing provision in
2B1.1(c)(3) are met, the Court applies the guideline applicable
to witness tampering, namely, 2J1.2.

Finally, the Court rejects the contrary reasoning
of the probation officer.  The probation officer summarily
concluded in the presentence report that the cross-referencing
provision was inapplicable, merely stating that application
note 17 provides examples such as false entries regarding
currency transactions or providing false statements to Customs
officer.  Defendant's conduct does not seem analogous.
Defendant's count of conviction sufficiently captured his
conduct on cross-referencing to another provision guideline is
not necessary.  That was in the PSR paragraph 44.

In addition, the probation officer in her
addendum to the presentence report merely states without any
analysis that it is the assessment of the probation officer
that the factual basis admissions cited by the Government do
not establish the offense of obstruction or witness tampering
under Section 1512.

As I have already stated and after conducting the
extensive analysis, the Court finds the factual bases do in
fact establish the offense of witness tampering.

While witness tampering in violation of

1512(b)(3) is not listed as one of the examples in application

note 17, those examples are not exhaustive, and the 9th Circuit

has applied the cross-referencing provision to offenses

involving fraudulent conduct not specifically listed.  And

notably, as the 2nd Circuit in *United States versus Genao* at

343 F.3d 578 implicitly recognized that Section 2B1.1(c)(3)

allowed the Court to sentence a defendant under 2J1.1, the

obstruction-of-justice guideline, rather than under 2B1.1 if

the conduct set forth in the count of conviction establishes an

offense specifically covered by 2J1.2.

Ultimately in that case the 2nd Circuit concluded

that the conduct set forth in the count of conviction did not

establish the violation because Section 1512(b)(3) requires the

specific intent to interfere with the communication of

information, and nothing in the count of conviction in that

case provided an explanation for why the defendant lied to

investigators.

In this case, in contrast, the count of

conviction of Count 1 specifically alleges that defendant

willfully falsified, concealed, and covered up material facts

by conducting an obstruction and witness tampering campaign.

Accordingly, the Court concludes that, upon the

consideration of the conduct in the four corners of Count 1 of

the Indictment, the defendant's conduct establishes all of the

elements of witness tampering under Section 1512(b)(3).

1    Moreover, the Court concludes that, upon consideration of the

2    conduct set forth in the factual basis of the defendant's plea

3    agreement which the defendant agreed to as part of his plea

4    agreement, defendant's conduct satisfies all the elements of

5    1512(b)(3).

6              As a result, the Court finds that the

7    cross-referencing provisions of 2B1.1(c)(3) is applicable

8    because the conduct set forth in the count of conviction

9    establishes an offense specifically covered by the

10   obstruction-of-justice guideline 2J1.2.  As such, the Court

11   applies 2J1.2(a) and finds that the defendant's base level is

12   base offense level 14.

13             The two remaining issues that the Court must

14   resolve in phase one relate to the extensive scope enhancement

15   that the Government argues should apply in this case which is

16   under 2J1.2(b)(3)(C) and the abuse of trust enhancement under

17   Section 3B1.3.

18             My tentative ruling with respect to each of those

19   enhancements is to deny those enhancements.  So in light of my

20   tentative ruling, I will hear from the Government if it wishes

21   to add anything.

22             MR. JENKINS:  Just very briefly, Your Honor.

23             In our view, in order to properly distinguish the

24   defendant's conduct here on all levels, meaning that it was not

25   just a single interview and a single lie but the escalation of

1    obstruction and false statements that would not be captured or

2    comparatively fairly compared to a defendant who obstructed

3    just a single time or told a false statement once during an

4    interview.

5                Here, as we outlined -- and I won't repeat --

6    argue that, as the focus on the defendant by our investigation

7    increased, so did his resolve to obstruct and to lie.  He did

8    so repeatedly.  He did so through multiple means.  And he did

9    so in order to increase the chances that he would get set free.

10   If he had stopped after interview one or obstruction one, we

11   believe he would be in a very different position at least

12   according to this guideline.

13               We think, in order to capture that conduct --

14   again, that started at the pay-to-play obstruction but became

15   an obstruction into the defendant himself.  After he lied to us

16   the first time, he committed a crime, an additional crime than

17   the one we were investigating.  After he immediately went to

18   obstruct with the businessperson, he committed an additional

19   crime.  When he returned voluntarily to be interviewed by us,

20   he sought not to just obstruct the pay-to-play investigation

21   but now his own direct increasingly illegal conduct.  To

22   incorporate that conduct is why we believe the extensive scope

23   enhancement to be appropriate in addition to two other

24   interviews and obstruction attempts.

25               THE COURT:  Do you want to argue anything on the

1   abuse of trust that's not in your papers?

2                   MR. JENKINS:  On the abuse of trust, no,

3   Your Honor.  We submit on the basis of the papers.

4                   THE COURT:  All right.  Since my tentative ruling

5   is going to be my final ruling, Ms. Levine, I take it you don't

6   wish to be heard?

7                   MS. LEVINE:  That is right, Your Honor.

8                   THE COURT:  The Government argues that the Court

9   should apply the two-level enhancement set forth in

10  2J1.2(b)(3)(C) because defendant's offense was extensive in

11  scope, planning, or preparation.  Specifically, the Government

12  argues the defendant's scheme was extensive because he lied to

13  the FBI multiple times during each of the three separate

14  interviews and engaged in obstructive conduct and attempted

15  witness tampering multiple times on at least three additional

16  separate occasions over a 14-month period.

17                  For the reasons stated in defendant's response to

18  the Government's objections, which appears as docket No. 48,

19  the Court does not find the defendant's offense was extensive

20  in scope, planning, or preparation.  Indeed, although defendant

21  made false statements and engaged in attempted witness

22  tampering on at least three occasions, those occasions all

23  related to a single multiple session proffer.  Those sessions,

24  including the timing of those sessions, were all arranged and

25  controlled by the Government.  Moreover, the false statements

1    were all made to the same lead prosecutor, the same case agent,

2    about the same topics.

3            Similarly, the defendant's attempted witness

4    tampering involved the same individual, Businessperson A,

5    involved the same or similar topic each time, and occurred just

6    prior to each of the sessions arranged by the Government.

7            Accordingly, the Court will not apply the

8    extensive scope enhancement set forth in 2J1.2(b)(3)(C).

9            As to the abuse of trust enhancement, the

10   Government next asked the Court to apply that two-level abuse

11   of public trust enhancement pursuant to 3B1.3.  The probation

12   officer found this enhancement was not applicable because there

13   was no indication that defendant's position as a city council

14   member significantly facilitated his commission or concealment

15   of the offense.

16           The Court agrees with the probation officer and

17   the defendant that the abuse of trust enhancement is not

18   applicable.  3B1.3 provides in relevant part, if the defendant

19   abused the position of public or private trust in a manner that

20   significantly facilitated the commission or concealment of the

21   offense, increase by two levels.  In order to apply this

22   enhancement, the defendant must have abused his position of

23   public trust in a manner that significantly facilitated the

24   commission or concealment of the offense at issue.

25           The Court concludes that the Government has

1  failed to demonstrate the defendant abused his official

2  position to facilitate or conceal the commission of that

3  specific offense.

4         In essence, the Government has asked the Court to

5  apply the enhancement based upon the mere fact that defendant

6  occupied a position of trust.  While the Court is certainly

7  outraged that the defendant lied to the FBI and tampered with a

8  witness while occupying a position of public trust, the fact

9  that defendant occupied a position of public trust by itself is

10 not sufficient to impose the enhancement.

11        Accordingly, the Court will not apply the abuse

12 of trust -- abuse of public trust enhancement.

13        Finally, there is one additional issue in phase

14 one which, based upon the Court's ruling on the base offense

15 level, the Government agrees that the obstruction of justice

16 enhancement set forth in 3C1.1 is not applicable if the Court

17 applies Guideline Section 2J1.2.  Accordingly, because the

18 Court has applied that guideline, the Court will not apply this

19 enhancement.

20        Accordingly and concluding phase one, the Court

21 calculates the base offense level at 14.  The defendant

22 receives a two-level reduction for acceptance of

23 responsibility.  The total offense level is at level 12.

24 Defendant's criminal history category is category one, and the

25 resulting guideline range is 10 to 16 months.

1          After calculating the advisory guideline range in

2    phase two, the Court must consider and take into account the

3    Congressional goals of sentencing as set forth in the

4    Sentencing Reform Act and impose a sentence that is sufficient

5    but not greater than necessary to reflect the principles stated

6    in 3553(a) and accomplish the goals or needs of sentencing as

7    set forth in Section 3553(a)(2).

8          I have, as I indicated, read all of the papers,

9    but I will certainly hear from counsel and the defendant if he

10   wishes to be heard.

11         Let's begin with the Government if you have

12   anything you wish to add.

13         I should note that it was the Government's

14   recommendation based upon their calculation of the advisory

15   guideline range -- well, I shouldn't say that.  It was their

16   recommendation -- the Government's recommendation that the

17   Court should impose a 24-month sentence.  I don't know if that

18   recommendation has changed in light of the Court's

19   determination as to the advisory guideline range.

20         The probation officer as well as the defense

21   requests a probationary sentence.  So let me hear from the

22   Government.

23         MR. JENKINS:  Yes, Your Honor.

24         To answer the Court's inquiry, we maintain that

25   24 months along with the other recommendations are appropriate

1    in large part, significant part, based off the arguments that

2    were made in our objection, repeated here as to the extensive

3    scope.  Whether the guideline applies, we do believe there is

4    significant aggravating factors that we maintain that

5    recommendation.

6                    I will be brief here.  Additionally, just --

7                    THE COURT:  Let me ask you a question.  It seems

8    to me that what the Government -- I'm sorry -- what the

9    defendant argues is that the Government's 24-month sentencing

10   recommendation is based on numerous speculative allegations

11   about the defendant who admittedly, according to the

12   Government -- and I want to confirm this -- he was not involved

13   in any pay-to-play scheme, in other words, he wasn't involved

14   in any bribery.  There is no evidence that he was.

15                   Yet the Government continuously makes statements

16   in the sentencing position paper that to me are wholly

17   speculative that, based upon the payment made by

18   Businessperson A of the $10,000 payment and the Las Vegas trip

19   and the 5,000 in Palm Springs, that would result in defendant

20   vulnerable to distasteful future conduct -- I'm going from my

21   notes here -- opening himself up and likely would have been --

22   likely would have blossomed.

23                   But all of those statements relate to a potential

24   bribery for which the Government has no evidence of.  So I

25   don't understand how you can continue to -- or how you argue

1    those things.  More importantly, Businessman A was cooperating

2    with the Government.

3            If you wanted to make a bribery case or tested

4    the defendant with respect to what Businessperson A was going

5    to ask in return for the $15,000 in -- $15,000 cash payment

6    that had been made as well as the other items that were

7    involved in the Las Vegas trip, you could have had

8    Businessperson A in one of these taped conversations or

9    telephone calls make a request of the defendant to provide him

10   with some conduct or some official act which would have

11   indicated that the defendant was open to participate in a

12   bribery scheme.

13           So your 24-month sentence to me is -- I can tell

14   you this.  I'm not going to impose a 24-month sentence.  But I

15   just don't understand how you can maintain the position that

16   you have in your sentencing position paper when you don't have

17   any evidence that he was involved in the pay-to-play.

18           MR. JENKINS:  Respectfully, I believe you are

19   missing something.  We argue that he was very much in the

20   pay-to-play investigation.  As the Court --

21           THE COURT:  Wait a minute.  He's in the

22   investigation, but there's no evidence that anything happened

23   during the course of that investigation that would support an

24   involvement in the pay-to-play.

25           MR. JENKINS:  And that's where we --

1          THE COURT:  But that's what you -- go ahead.

2          MR. JENKINS:  I can respond, Your Honor.  That's

3   why I began with he was in the pay-to-play investigation.  At

4   the time in the summer of 2017 the person who he received cash

5   from, not as a loan, not to pay for some sandwiches in

6   Las Vegas, illicitly in the bathroom in cash was also the

7   person we knew to be paying other public officials including

8   other councilmen at that time.

9          To the Court's question absolutely we would have

10  pursued other investigative means to see whether

11  Defendant Englander would have engaged in a quid pro quo.  The

12  reason we did not allege that is because we did not establish a

13  quid pro quo.  That is correct.

14          But I think what the Court I believe is maybe

15  just not -- why we focus on the potential is that that is

16  because Defendant Englander in as alleged admitted in August of

17  2017 was aware that the FBI was investigating that trip, George

18  Esparza who he was on the trip with, Businessperson A,

19  Defendant Englander's staff member.  It would be, and I

20  believe, very surprising if Defendant Englander after learning

21  all of that information about the investigation and then we

22  sent a source in to ask him if he wanted to accept the bribe or

23  do a quid pro quo based off the money that that businessperson

24  was provided, I don't think Defendant Englander respectfully

25  would be that naive because he knew we were investigating that

1    very trip.  He knew he took money during that trip from the

2    person we were investigating.  So instead --

3                    THE COURT:  Let me just interrupt.  I could be

4    wrong.  I have a memory that the primary reason that the

5    investigation focused on the defendant or that he was asked to

6    come in for this interview is that there was a -- is that --

7    and I don't remember who the parties were, but something was

8    picked up in an early June -- and my memory serves me -- was

9    like a June 3rd Title III wire interception, that there had

10   been money paid to the defendant and others who participated in

11   the Las Vegas trip, and that was the motivation or the primary

12   motivation for the Government to then invite the defendant in

13   for the interviews which commenced in October.

14                    Am I misrecollecting that?  So it seems to me he

15   never would have been on the radar of the Government unless the

16   information -- save and except for the information -- and I

17   don't remember the specifics of it, and it could be wrong --

18   that was picked up over the early June Title III wire

19   interception.

20                    MR. JENKINS:  You are close, and I will just

21   clarify for the record.  At the time of that Las Vegas trip, we

22   had a Title III wiretap on George Esparza, Jose Huizar's

23   special assistant, who was in Las Vegas with

24   Defendant Englander.  At that time a call was intercepted

25   between George Esparza and Council Member Jose Huizar

discussing benefits that Businessperson A had provided to the

entire group, the same businessperson we were investigating for

his role in bribery, and that the particular benefit included

prostitutes that George Esparza had utilized and had sent to

Defendant Englander's room.

Jose Huizar later confirmed in an additional call

that Defendant Englander had gotten, quote, "girls," meaning

prostitutes.  That certainly got Defendant Englander on our

radar, Your Honor.  That is correct.  And at that point we

continued to investigate what other benefits, if any,

Defendant Englander received.  And slowly we learned more and

more about those things.  At the time Businessperson A was not

cooperating.  Businessperson A --

THE COURT:  But by August 2017 Businessman A

began to cooperate with the FBI.  So certainly whatever --

whatever happened during the -- and whatever conversations took

place with respect to the payment of the $10,000 in the casino

men's room, you now in August of 2017 had access to

Businessman A to tell you what those conversations were.

And, more importantly, it seems to me -- and I

haven't seen any evidence of this -- you also had Businessman A

who is now cooperating.  What does he say about why he paid

$10,000 in the Las Vegas trip and $5,000 in the Palm Springs

trip?

MR. JENKINS:  He says exactly what is alleged in

1    the Indictment which includes that he was paying for influence.

2    He was paying because he wanted to increase his financial

3    prospects in the city including by providing benefits to people

4    like Defendant Englander who sat on one of the most powerful

5    committees in the City of Los Angeles.

6              Moreover, shortly after the Las Vegas trip and

7    the Palm Springs trip, Defendant Englander cashed in on that

8    payment, and he set up a meeting, the exact thing

9    Businessperson A was asking for, shortly after the Morongo trip

10   where at that point he's gotten $15,000 in cash in bathrooms.

11   He agrees from the person paying him illicit money that, yes, I

12   will help you.  I have a developer friend who does projects.

13             THE COURT:  But that is not a crime.

14             MR. JENKINS:  That is not yet a crime,

15   Your Honor, but that is why --

16             THE COURT:  Not yet a crime.  A simple

17   introduction of the developer to Businessperson A is not a

18   crime.  It's not done in his official capacity.

19             MR. JENKINS:  Respectfully, Your Honor, that's to

20   your question.  We were investigating that interaction.  The

21   Court's question was what were we looking at and when.  And we

22   have agreed we didn't charge Defendant Englander with bribery.

23   But we were explaining there was an escalating conduct

24   consistent with what Businessperson A was doing.  In a related

25   case Indictment, there are overt acts charging Jose Huizar for

1  similar conduct meaning --

2         THE COURT:  But I'm not sentencing this defendant

3  for the acts of Mr. Huizar.  Again, I have implied the witness

4  tampering enhancement, but you appear in your papers and this

5  morning to be seeking an imposition of a sentence related to

6  this defendant committing bribery which there is simply no

7  evidence of.

8         MR. JENKINS: Respectfully, Your Honor, that is

9  not the Government's position that our sentence is linked to

10  bribery.  If we had charged him with bribery, we would have

11  asked for a more significant sentence.

12         My response to the Court's question was you said

13  that could never be a crime, and I was pointing out, in fact,

14  that became a crime in a very similar case meaning the

15  escalation in Jose Huizar's ended up as a crime.  So we

16  disagree that it could never result in a crime when, in fact,

17  the very same businessperson engaged in a very similar pattern

18  in a charged related Indictment.  But I agree --

19         THE COURT:  I'm simply not going to consider that

20  in fashioning the sentence to impose on the defendant in this

21  case.  I think the -- I understand your argument, but I am

22  not -- I don't think it's an appropriate argument when it comes

23  time to imposing sentence on this defendant.

24         Anything else you wish to add?

25         MR. JENKINS:  Yes.  We are not asking you to take

1  that into consideration.  We are saying that provides part of

2  the motive for the obstruction.  Our 24 months is linked to the

3  extensive scope obstruction and witness tampering for which we

4  believe the defendant had various motives.  But, yes, we are

5  not asking the Court to impose a bribery sentence or bribery

6  conduct on the defendant.

7                    THE COURT:  All right.  Anything else?

8                    MR. JENKINS:  Not at this time, but if we can

9  respond to any defense arguments if the Court will indulge us.

10                    THE COURT:  All right.  Ms. Levine, I will hear

11  from you, and does your client wish to be heard?

12                    MS. LEVINE:  Yes, he would, Your Honor.  Would

13  you like to hear from him after me?

14                    THE COURT:  Whichever you prefer.  Probably makes

15  more sense after you.

16                    MS. LEVINE:  Thank you, Your Honor.

17                    Obviously hearing the colloquy between

18  Mr. Jenkins and the Court, the Court understands the offense

19  very well and the nature and circumstances of the offense.

20                    In fashioning the sentence here, it is the

21  offense plus the rest of the 3553(a) factors, and I want to go

22  through some of them, Your Honor.

23                    THE COURT:  Let me ask you a factual -- a couple

24  factual questions because this is something that has always

25  puzzled me.

1        Why did your client go to such efforts to hide

2   the lies that he told to the Government?  On three separate

3   occasions -- you have October 19, 2017; February 7 of 2018; and

4   December 31st of 2018.  I just -- I know in his letter and in

5   your papers you have indicated that he wanted to -- the purpose

6   of the lie was to cover up embarrassing information.  But I

7   just don't buy that.  I think there's -- there has to be a

8   different reason.

9        I don't know if it had to do with -- obviously

10  once -- if this information came out that he was accepting cash

11  in a casino men's room, that it certainly wasn't going to play

12  well with respect to his continued service as a council member.

13  But I just -- that has always puzzled me.  If you could address

14  it, I would appreciate it.  If your client wishes to address

15  it, I will certainly hear from him.

16        MS. LEVINE:  Your Honor, I will try the best I

17  can.  And, frankly, Your Honor, in preparing for today, which

18  began when we first heard from the Government they were going

19  to charge a case because Mr. Englander never intended at that

20  point to deny it, the question was how to get to the root of

21  what happened here.

22        But certainly the public knowledge of these facts

23  would have two impacts -- both with his family and friends and

24  people with whom he has a personal relationship, the 50 years

25  of building a reputation and a persona of one of the good guys,

1    one of the people that did the right thing all the time, one of

2    the people that could walk into a room and be respected would

3    be gone.  And that's a lot to lose, especially from the people

4    you love.

5               But also, as the Court knows, politicians, public

6    figures are used to having a certain modicum of respect or at

7    least at some point in this country we are used to having a

8    certain modicum of respect from the people around him.  And to

9    lose that, to have this come out had its own embarrassment.

10              At the time this was going on, certainly

11   Mr. Englander was in that age where people reflect on their

12   lives and see what they have done and haven't done.  There was

13   a question of higher office or no higher office.  Certainly he

14   would have been turned down at the end of his term from the

15   L.A. City Council.  So all of those things were obviously

16   playing into a decision which, once the decision was made, it

17   exacerbated on itself, I would say, Your Honor.  And once you

18   make a false statement and then you meet with the informant,

19   the Government has you meet with the informant, and then there

20   is another thing, it snowballs.

21              Certainly, as the Court asked the first time I

22   appeared before Your Honor in this case whether I was there, I

23   was there when the statements were made.  Just like

24   Mr. Jenkins.  It's somewhat odd in that instance being an

25   actual witness and now counsel on the underlying crime.  But I

 1   would say that it was all about what people think of you top to

 2   bottom.  And certainly it was one massive set of wrong moves.

 3   It is in contrast with the rest of Mr. Englander's life.  It's

 4   so out of character.

 5              THE COURT:  So why didn't he just simply decline

 6   the Government's request for an interview?  He wasn't

 7   subpoenaed to a grand jury.

 8              The problem that I have is that he accepts the

 9   invitation for the first proffer session, and going into the

10   first proffer session he's made up his mind he's going to lie.

11   And then, as you say, once you tell the lie, the next two

12   proffer sessions just build layer upon layer of the lies, and

13   of course he's got to make sure that Businessperson A is

14   onboard with his lies so ultimately his lies aren't exposed.

15              MS. LEVINE:  The question you asked is the

16   question one asks a lot when one sees statements people make in

17   various of these kinds of cases.  Why did they go in?  Why

18   did -- I have gone a few times as a guest lecturer in law

19   schools actually on obstruction.  And one of the questions is

20   why did Martha Stewart go talk?  It's the same question the

21   Court is asking.  I don't know.  I can't explain it.  And

22   Mr. Englander has not been able to articulate the reason why.

23              I think that we worked harder on making sure he

24   doesn't do anything again, he doesn't do anything wrong again.

25   That's been much more of his focus seeking forgiveness and

1   trying to figure out how to move forward.  But it is certainly

2   a question that is asked.  I just don't have the answer.

3               THE COURT:  Well, it's been my experience in

4   these type of cases that typically it's driven by someone who

5   is in a position of power, and it's basically arrogance and

6   thinking that they will never get caught and, if they do get

7   caught, because of their position, that the consequences are

8   not going to be significant.

9               I don't know if that is the explanation in this

10  case, but certainly I have been doing this now for 20 years and

11  sentencing a lot of individuals in various types of white

12  collar crimes.  Those appear to me to be rational

13  justification -- not justification but rational reason as to

14  why one would engage in this conduct.

15              In any event, I won't interrupt you.  Go ahead.

16              MS. LEVINE:  No, Your Honor.  Any time the Court

17  wishes to interrupt, I can always somewhat find where I was.  I

18  just want to actually begin with addressing on -- well, let me

19  begin which wasn't in my notes.

20              With the Court's ruling on what the guideline

21  level is, the guideline level 12 which is zone C, in the

22  footnote in both -- two of our sentencing papers in discussing

23  just -- obviously, as the Court knows, our argument was for

24  probation.  Our argument was to follow the guideline as

25  suggested by the presentence report which would have required

1   no variances.

2              As a zone C, as the Court knows, a sentence that

3   the Court could impose can include imprisonment or -- home

4   incarceration or imprisonment.  If the Court were to vary down

5   one level, it would be into a zone B sentence which would be

6   eligible for home confinement without custody.  So I begin with

7   that as a request, Your Honor, before I get into the substance

8   of what I am discussing that the Court, when it sentences, that

9   it sentences in a zone that allows no custody time in actual

10  prison.

11             I don't intend to detail some of the problems

12  with prison systems right now.  If the Court pleases, I may

13  discuss it at the end.  But that's one of the considerations.

14             I also wanted to begin with a side note.  In the

15  Government's papers they talk about the need for substantial

16  sentence because of distrust of Government.  And I don't mean

17  to be flippant at all about distrust of Government.  Nobody

18  that is a believer in the system -- and I am a heartfelt

19  believer in our system and democracy and justice -- cannot

20  worry about distrust in our system.

21             But in sentencing Mr. Englander, I ask the Court

22  to look at Mr. Englander, not at looking at the sentence as a

23  cure of something huge that he didn't create.  Every time in

24  our world we try to cure ills from a single sentence, we run

25  into problems whether they be in our history in the 1600s from

1  the Salem witch trials to the 1980s and '90s in our drug wars.

2  We need to look at Mr. Englander and who he is and the other

3  considerations in the sentencing and not put on the sentencing

4  an importance effect that it cannot have.

5            This sentence will not cure or even impact

6  distrust in Government, and any sentence that this Court

7  imposes will have the impact of making a stamp that lying to

8  the Government is never okay whether it's on, as the Government

9  suggests, a single forum and a single instance the types of

10 cases that aren't actually ever prosecuted really for lying

11 like this.  It's never okay.

12            And nothing about what I said or what

13 Mr. Englander has said to this Court and certainly nothing

14 about how he's behaved in dealing with this case since he was

15 told about the Indictment, the promptness with which he

16 accepted responsibility, the fact that, despite the COVID

17 outbreak we have gone forward and entered the plea and are here

18 today for sentencing, and in the year we're in is about as

19 quick a way as you can do to suggest that there is disrespect

20 or that he doesn't take it seriously.

21            Without addressing the offense any further,

22 Your Honor, I would like to move to Mr. Englander himself.  The

23 Government talks about a wealthy, privileged white collar

24 offender.  As the Court knows, I have objected to that.

25 Mr. Englander is not wealthy.  He certainly didn't rise from

1    privilege.  Although he feels privileged to be in the place he

2    is with the family he has, he isn't a child of privilege as

3    it's put.

4              And this is a crime of lying.  It's not your

5    traditional white collar crime.  It can be committed by

6    anybody, anywhere, anyhow, and we're all supposed to be honest

7    with the Government.  The cases the Government cites about the

8    specter of white collar crime or the need for long sentences in

9    white collar offenses, the citations to a pre-guideline senate

10   report which may have been written before Mr. Jenkins was born

11   or close around that time, Your Honor, has no bearing.

12             As the Court recalls from the time of the early

13   '80s before guidelines, sentencing was very different than it

14   is now.  And the impact of the guidelines, whether you agree

15   with them or not, has been to make this, quote, from the 1980s

16   pre-senate report really dated.

17             Mr. Englander is an interesting man, Your Honor.

18   He had a very difficult background which the -- for the

19   kindness of strangers like the big brother he had and friends

20   he met and the luck of meeting his wife was able to succeed and

21   to take the lessons he learned and try to make the world

22   better.  So he needed help as a young man, and when he got

23   older and could, he helped fund and raise money for YMCA and

24   boys and girls clubs and other things.

25             He had a close family member who died really from

1    lack of hospital care, and he spent time and money to get

2    better hospitals and more services which, you know, Your Honor,

3    today we really know that we need.  He became a reserve police

4    officer giving up his time for about 13 years because of the

5    horror he felt when his own uncle was killed in a murder, and

6    he worked very hard for that position and was very good at it.

7              So his positions are important, but some of the

8    things that is represented in his letters show a person that is

9    far beyond positions or roles or something, somebody that could

10   stop and jump into a train wreck and do the hardest job ever to

11   retrieve bodies and body parts and work through the night is a

12   different person -- a very different person than his crime

13   alone would suggest.  Somebody who stops on the side of the

14   road to help people, who, when he was hiring, hired people

15   based on potential as opposed to prejudice or kind of

16   traditional hiring decisions, somebody who created

17   relationships in his life because of how much he was willing to

18   give to others.

19             When the Court considers almost any of the things

20   he did, each of them alone would be the kind of thing where

21   someone would say this man merits consideration from the Court.

22   He merits a sentence that may be less than that which would be

23   in the guidelines.  And that's the person that is being

24   sentenced here.

25             The Court noted the 3553 factors, and it's

 1    supposed to be the sentence that is the least restrictive

 2    sentence -- and I don't have the words.  I can't remember

 3    them -- to fulfill the purposes.

 4              Mr. Englander is not a danger.  He doesn't create

 5    a public safety danger.  He has been deterred.  And I think

 6    that, despite the Government's argument that a long sentence is

 7    necessary to deter others, the losses that he has suffered

 8    would deter others from committing this crime -- the loss of

 9    public respect, the loss of position.  And as the Court knows,

10    if you're a felon in our world, you're a felon until the day

11    you die.  And that mark doesn't go away.

12              And what does that mean on a day-to-day basis?

13    It means you can't get a bank account.  You can't do regular

14    financing.  You can't travel to places you might think you can

15    easily travel to.  Jobs are hard.  Getting homes are hard.  All

16    of those things become a lot harder and punish you every day of

17    your life.  Mr. Englander without this offense, when he passed

18    away, would have had an obituary talking about an ex-city

19    councilman.  His obituary will begin with this crime.  It will

20    follow him everywhere he goes.

21              And so probation or a sentence of home

22    confinement, Your Honor, is not a sentence that lets this man

23    off the hook.  He has been and will continue to be punished

24    from this.

25              Your Honor, there's a lot that goes into a

1  decision, I know, in sentencing.  It's not the crime itself.  I

2  assure you that Mr. Englander takes what he did very seriously.

3  But it's also not okay, as the Government would suggest, to

4  ignore the other 50 years of what Mr. Englander has

5  contributed, and those have been important.

6       To give him a sentence that does not require time

7  in a penal facility, Your Honor, is not desperate from what the

8  guidelines would suggest as the Court figured the guideline.  I

9  would suggest to the Court and urge the Court to find a

10  sentence at a level 11, sentence Mr. Englander to probation

11  with home confinement.

12       And I would actually urge the Court also, if it

13  feels it makes a difference, Your Honor, Mr. Englander, as I

14  said, has no -- will be doing community service.  If the Court

15  thinks it makes sense to put that in the sentence, he has no

16  quarrel with that whatsoever.  If the Court doesn't, he will

17  continue to do it because that is the nature of what he's done

18  and what he's taught his children to do.  He is a child who was

19  able to thrive because of others' community service, and he has

20  been focused on and intends to give back.

21       Your Honor, I would ask the Court to impose a

22  fine within the guideline level and defer to the Court's

23  discretion on that.

24       THE COURT:  All right.  Does your client wish to

25  be heard?

1          MS. LEVINE:  Yes, Your Honor.  He would like to

2     stand.

3          THE COURT:  All right.

4          THE DEFENDANT:  Can you hear me, Your Honor?

5          THE COURT:  Yes, I can.

6          THE DEFENDANT:  Thank you.  You asked a question

7     why.  I ask that question to myself every single day, and I

8     have since this nightmare started.  Your Honor, there are few

9     things I remember my mother always telling me growing up, and

10    one was the most important thing you have in your life, the

11    most important thing that you have is your reputation because

12    from that comes trust and love and your relationships.  It

13    makes it who you are.  I tarnished that.  I shattered that.

14    The why isn't so much than what I ask myself every day, to

15    spare myself of embarrassment perhaps.  It's a lot of other

16    factors.  And, in fact, it was through this process that helped

17    me discover what that why might be.  I don't know.

18          Specifically -- and I give no excuses.  I own

19    what I did, and I take full responsibility 100 percent.  In

20    fact, I have been through many tragedies in my life, horrific

21    tragedies, and this is by far the worst because I created it

22    and I hurt the very people I love the most.  And so I apologize

23    to the Court.  I apologize to the FBI.  I apologize to the

24    community and to constituents.  And most importantly, I

25    apologize to my family, my wife, my daughters.  I hurt them.

1   And this is something that will forever be in our past and our

2   future.  And I need to move on from that.

3           One of the things I want to add to that too is

4   during the PSR -- I've never went through this process, and I

5   promise you I will never go through it again -- the PSR pointed

6   out for me that I did have a tragic childhood, and she actually

7   asked me if I ever had therapy.  I didn't realize that I

8   hadn't.  I didn't really ever think about that.  I had a lot of

9   people helping me, friends helping me over the years.

10          And I -- since this happened in March, I have

11  been going to therapy and learning a lot about things I have

12  never dealt with personally in my past.  And I don't offer that

13  as an excuse at all.  I take full responsibility.  But you ask

14  why, and I'm working on that because there is no excuse.  And I

15  apologize again.

16          And I ask, Your Honor, when thinking about

17  sentencing, the things that I have done to help so many people

18  for so many years and what I can continue to do for the future

19  and so much more.  Thank you.

20          THE COURT:  All right.  Is there any reason why

21  sentence should not be imposed?

22          MS. LEVINE:  No, Your Honor.

23          MR. JENKINS:  No, Your Honor.

24          THE COURT:  All right.  I have considered in

25  fashioning the sentence in this case all of the 3553(a) factors

1  and made an individualized assessment based upon the facts and

2  arguments presented by the parties, but I want to comment on

3  several of those factors.

4           The first is the nature and circumstances of the

5  offense which is captured by the factual basis for the

6  defendant's plea of guilty which is attached as Exhibit A to

7  the plea agreement and the offense conduct section of the PSR

8  which I incorporate as part of my analysis of this factor.

9           The defendant and the Government have

10  dramatically different views of the defendant's criminal

11  conduct in this case.  The Government argues the defendant was

12  a corrupt politician and made himself vulnerable to potential

13  bribery by accepting cash and other benefits from

14  Businessperson A.  However, because of the grand jury

15  investigation and that fact that Businessman A decided to

16  cooperate with the Government in August of 2017, defendant was

17  never presented with an opportunity to perform any official

18  acts to benefit Businessman A in exchange for the cash or other

19  benefits he received in June of 2017 or, in other words, commit

20  bribery.

21           Instead, he embarked upon an elaborate scheme to

22  cover up his involvement with Businessman A by lying to the FBI

23  and counseling and instructing Businessman A how to lie to the

24  FBI during his interviews so that the lies the defendant told

25  in his three interviews would not be exposed.

1          The defendant freely admits he was not truthful

2     during each of his three proffer sessions but claims

3     disingenuously, in my view, that his false statements were

4     intended to shield him from personal shame, public scorn, and

5     embarrassment for his inappropriate conduct.

6          The defendant correctly notes that the Government

7     has never alleged any federal crimes arising from the June 2017

8     Las Vegas and Palm Springs trips and the cash that he secretly

9     received from Businessman A in the casino men's bathroom.

10    However, that ignores the fact that there were pending federal

11    investigations in the corruption in the City of Los Angeles and

12    that fact certainly did not give the defendant the right to lie

13    about his June 2017 trips on three separate occasions.

14          The defendant's analysis of the nature and

15    circumstances of the offense is understandably simple and

16    straightforward keeping with their view that this is simply a

17    1001 violation.  Specifically, the defendant points out that

18    the defendant's offense only involves false statements made by

19    the defendant about his interactions with Businessperson A that

20    occurred over approximately a 12-day period.  These

21    interactions occurred on a trip to Las Vegas and a charity golf

22    tournament at the Morongo Casino & Resort in Palm Springs.

23    Those interactions can be summarized as follows:

24          The defendant accepted benefits from

25    Businessperson A during the trips to Las Vegas and Palm Springs

1   totaling $15,000 in cash which was delivered on two separate

2   occasions inside casino bathrooms where there are no

3   surveillance videos.  He also received hotel accommodations,

4   extravagant meals, shared in a $34,000 bottle service at a

5   nightclub and escort services.  Other than public -- other

6   public officials accompanied the defendant on the Las Vegas

7   trip including a high ranking member of the defendant's staff

8   and George Esparza, a staffer for Mr. Huizar who was a fellow

9   city council member.

10          Within days of these trips, defendant agreed to

11   and arranged for Businessperson A to meet with a developer to

12   promote his business which, as the defendant correctly points

13   out, was not a crime.  This 12-day period provided the

14   underlying subject matter of the defendant's untruthful

15   statement or lies, but nothing that the defendant did in those

16   12 days is itself alleged to be a federal crime.  Instead,

17   according to the Government, it's simply the subject matter of

18   the false statements.

19          Defendant also notes that Businessman A had no

20   business dealings with Mr. Englander.  He did not solicit

21   defendant to perform any officials acts or provide any official

22   benefits to him or his businesses or to provide any official

23   benefits to any third party.

24          The Government points out that by August of 2017

25   the defendant learned that the FBI was investigating public

1  corruption in Los Angeles and specifically they were

2  investigating the Las Vegas trip.  After learning of the

3  federal investigation, defendant engaged in a campaign of false

4  statements, obstruction, and witness tampering.  Defendant's

5  obstruction campaign was calculated, extensive in scope and

6  duration, and designed to mislead investigators.

7             For example, shortly after learning about the

8  investigation, the defendant created a document to mislead

9  investigators.  Although months had passed since the June 2017

10 trips and defendant had met with Businessperson A on at least

11 two occasions without offering to reimburse any expenses for

12 the trips, he sent a backdated reimbursement check to

13 Businessperson A for hotel and meals but for some strange or

14 unknown reason not the $15,000 in cash after learning that the

15 FBI was asking questions.

16            He, of course, backdated the check to

17 August 4, 2017, to give the impression that he always intended

18 to reimburse Businessman A for those expenses before the FBI

19 had requested his interview.

20            By October 4th of 2017, the defendant had learned

21 that the FBI had interviewed three witnesses from the Las Vegas

22 trip -- Businessperson A, City Staffer B and Mr. Esparza.

23 Defendant began coordinating his false and misleading story

24 with those witnesses including meeting with City Staffer B and

25 by telling Businessman A what City Staffer B had been asked and

1   how he responded to the questioning of the FBI.

2           Defendant had more than one month to consider the

3   choice he would make when the FBI questioned him.  He hired

4   attorneys to counsel him and had weeks to consider his options

5   which apparently presented him with a difficult choice.

6   Defendant could have candidly admitted that he accepted $15,000

7   in cash from Businessperson A who has suspicious dealings with

8   multiple public officials in Los Angeles which would have

9   potentially assisted federal investigators in uncovering public

10  corruption, or defendant could have simply declined to be

11  interviewed by the FBI.  Instead, for some unknown reason, he

12  decided to participate in the interviews and deliberately lie.

13          During the course of the 18 months, defendant

14  spoke to federal investigators on three separate occasions and

15  repeatedly lied to cover up his unethical behavior and his

16  criminal conduct.  Defendant's last interview on December 31st

17  occurred less than two months after the FBI executed widely

18  publicized search warrant at Mr. Huizar's residence and city

19  offices.  Armed with personal knowledge that a corrupt

20  businessman who had ties with Huizar's staff had also provided

21  him $15,000 in cash, the defendant still willfully and without

22  hesitation chose to mislead investigators by lying about his

23  own receipt of gifts from the same individual.

24          Defendant did not stop at repeatedly lying to

25  federal agents and prosecutors.  Defendant used encrypted and

1   disappearing messages to coordinate his story with a witness.

2   He then lied to the FBI about ever using the messaging service.

3   He urged Businessman A to use a different phone number when

4   discussing the FBI demonstrating a concern that their phones

5   were being tapped and calculated an attempt to avoid detection.

6   Defendant changed the meeting location at the last minute,

7   turned up the car stereo, and drove in circles around the block

8   while instructing Businessman A on how to respond to the FBI

9   questions, again, demonstrating an attempt to avoid law

10  enforcement surveillance and listening devices.

11          The defendant was caught on recordings attempting

12  to repeatedly tamper with the witness in the federal

13  investigation.  He unhesitating and brazenly directed

14  Businessman A how to answer questions that he would be asked by

15  the FBI.  He told Businessman A what information to withhold

16  and how to lie to the FBI.

17          Defendant repeatedly portrayed himself as someone

18  knowledgeable on how investigators would approach the

19  interview.  Only after being confronted with substantial

20  evidence of his crimes which included recordings of his own

21  words, the defendant finally admitted he counseled

22  Businessperson A on how to lie and mislead the FBI and

23  U.S. Attorney's Office.

24          In each of the proffer sessions, counsel points

25  out that defendant truthfully answered questions about the

1   Government's core investigation and that he limited or only

2   made false statements about his personal conduct that is not

3   alleged to be a federal crime -- that occurred in June of

4   2017 -- and that his meetings with Businessman A which

5   discovery indicates were all monitored by the Government.

6           Although I agree there is no evidence defendant's

7   false statements are directly related to the Huizar allegations

8   or that the defendant engaged in a pay-to-play scheme, I

9   disagree with the defense simplifying a summary analysis of the

10  nature and circumstances of the defendant's criminal conduct.

11  In paragraph 8 of the factual basis for his plea of guilty, the

12  defendant admitted the following:

13          From on or about August 2017 to about

14  December 31st, the defendant knowingly and willfully falsified,

15  concealed, and covered up trick, scheme, and device material

16  facts, namely, that defendant had accepted from Businessman A

17  items of value such as cash payments, hotel rooms, luxury

18  outings, and expensive meals and had been offered escort

19  services.

20          Defendant had attempted to coordinate statements

21  he made to the FBI and U.S. Attorney's Office with

22  Businessperson A, and defendant had counseled Businessperson A

23  on how to lie and mislead the FBI and U.S. Attorney's Office.

24  This paragraph then describes in detail how defendant carried

25  out this scheme.

1          Those specific admissions and his extensive

2    admissions show the grid points he undertook to make sure that

3    Businessman A was onboard and would corroborate the layers of

4    lies that he told to the FBI on three separate occasions makes

5    this a much more serious case than characterized by the

6    defense.

7          I agree with the Government that, after the

8    defendant learned of the investigation, he could have simply

9    declined the FBI's request for an interview or admitted that he

10   accepted the $15,000 in cash.  Instead, he chose to lie and

11   engage in this elaborate and clandestine scheme to hide his

12   lies, making sure that Businessman A would also lie during his

13   interviews with the FBI in order to coordinate defendant's

14   lies, thereby preventing the FBI from discovering the true

15   facts about the June 2017 trips.

16         I suspect it was more than mere personal

17   embarrassment that motivated defendant to engage in this

18   elaborate scheme.  It's not difficult to conclude that the

19   defendant was undoubtedly fearful of losing his prestigious

20   position as a city councilman and the prestige and benefits

21   that are provided to individuals in such positions, especially

22   when the voters learned that he was accepting benefits during

23   the June 2017 trips including cash delivered to him in casino

24   men's rooms.

25         I also, as I indicated, have found over the years

in most white collar cases defendants such as this defendant
engage in criminal conduct typically out of greed or arrogance
because they believe it is highly unlikely that they will be
caught.  Moreover, they believe that, if caught, given their
position and power, they will not be sent to prison.  Without
any persuasive contrary explanations, I conclude that greed and
arrogance must have also motivated in part this defendant.  In
my view, this factor requires a substantial custodial sentence.

I have also considered the history and
characteristics of the defendant.  The defendant's early years
were very difficult, and to his credit he was able to overcome
the tremendous challenges that he faced after his father
abandoned the family both physically and financially which
resulted in defendant being raised by his mother and living in
a string of temporary residences and at a time becoming
homeless.

Because of his family financial struggles, he
began working when he was 9 years old selling candy
door-to-door, mowing lawns, and later working for a janitorial
service owned by his uncle.  Because he worked full time,
defendant completed high school by taking classes in the
morning so he could work at night.  After high school defendant
moved to Arizona.  He attended Scottsdale Community College and
studied marketing and accounting.  He left Arizona, and from
1990 to '91 he attended Orange Coast College in Costa Mesa.

1          Defendant has a strong record of employment.

2   From July of 2003 to March of 2011 he worked as the chief of

3   staff for City Councilman Greg Smith.  He was elected and

4   served as a council member from March of 2011 to

5   December 31st, '18, when he left to pursue a career in sports

6   and live entertainment at Oak View Group.  The defendant has

7   also become -- also became a sworn LAPD officer in 2005.  He

8   graduated at the top of his class and served over ten years on

9   the Los Angeles Police Department.  Although reserve officers

10  are required to complete at least 13 two-day employments, the

11  defendant did much more during his career as an LAPD officer.

12  The letters submitted by his fellow LAPD officers all attest to

13  his commitment and dedication to carry out the duties of his --

14  his duties as an LAPD officer.

15          While he was a member of the city council, the

16  defendant had many significant accomplishments that are

17  described in his sentencing papers as well as the letters of

18  support.  They include reconstruction of the San Fernando

19  Valley Mission, development of a fire stat program to improve

20  response times of firefighters, and the Feed-In Tariff Clean

21  Energy Program, and he led the effort to require body cameras

22  for police officers.

23          The Court has received an overwhelming number of

24  letters of support.  I can only recall a few cases where I have

25  received so many letters.  The letters were very helpful and

1   important in understanding the defendant and in determining the

2   defendant's character.  The letters come from family, fellow

3   LAPD officers, co-workers, neighbors, and friends.  Each letter

4   describes specific act of good works, compassion, love, and

5   support from family, friends, business associates, and fellow

6   LAPD officers.

7              They uniformly characterize the defendant as a

8   generous, caring, compassionate, dedicated public servant, good

9   guy, great father and family man, loyal friend, honest and

10  hardworking who made a mistake and who readily admits he made a

11  mistake and all suggests he has been punished enough by his

12  plea of guilty, the loss of his job, the loss of his

13  reputation, and they all urge the Court to impose a

14  probationary sentence.

15             Although all of the letters are important, I'm

16  going to comment on the powerful and insightful and moving

17  letters from the defendant's wife and his two daughters which I

18  believe fully capture the true character of the defendant in a

19  more important way than all of the other letters combined

20  because they know him the best.

21             The defendant and his wife each had challenging

22  childhoods and experienced many tragedies, but they did not

23  allow those experiences or tragedies stop them from becoming

24  caring, loving, respectful to each other but also to their two

25  very talented daughters.  Defendant's wife acknowledges that

this criminal case has been mentally agonizing, financially worrisome, and emotionally painful, but she is confident that the entire family will survive this ordeal and come out stronger.  Defendant's daughters point out that the defendant has been and is a great father.  They continue to support and love him in this difficult time, and he will always be their hero.

Although the letters were important and I do not question the sincerity of the authors of these letters, I do recognize that, when a successful politician stands before the Court to be sentenced, he or she can usually present evidence of any good qualities and bring before the Court others who will attest to those qualities.  This ability is often a reflection of what originally brought the defendant to prominence in public life.  However, to place too much emphasis on those qualities would run the risk of not punishing people in public life for their crime.

On the other hand, I am reminded of what one of my colleagues has said about considering defendants' good qualities at sentencing.  "If ever a man is to receive credit for the good that he has done and his misconduct assessed in the context of his overall life, it should be at the moment of his sentencing when his very future hangs in the balance."  This elementary principle of weighing the good and the bad was plainly what congress had in mind when it directed the Court to

1   consider the history and characteristics of the defendant as a

2   sentencing factor.

3            The Court must not lose sight in imposing

4   sentence that defendant's conduct has undermined the public's

5   trust in its city officials and has caused damage to the

6   public's confidence in city government.

7            There is no question that a prison sentence will

8   have a tremendous impact on his family, especially his wife and

9   daughters, but this is true in most cases, and there are no

10  unusual factors present in this case that would preclude a

11  custodial sentence.

12           I have carefully read and reread Mr. Englander's

13  letter, and although it expresses remorse, it fails to answer

14  the crucial question about how he became involved in this

15  criminal conduct and, more importantly, why he involved others

16  after a lifetime of good deeds.  There is simply no adequate

17  explanation as to how he totally lost his moral compass and

18  committed this crime.  I suspect that there was a degree of

19  arrogance associated with his criminal conduct and a belief

20  that is held by many similarly situated defendants that he

21  would never be caught and, in the unlikely event that he was

22  caught, the consequences or punishment for his crime would not

23  be severe because of his stature in the community.

24           I do recognize the painful and devastating ordeal

25  that defendant has experienced as a result of these proceedings

1    and the black spot that it is left on an otherwise clean and

2    impressive resume of his accomplishments.  Instead of enjoying

3    well-deserved recognition for his accomplishments, his criminal

4    conviction has destroyed his personal legacy, has subjected him

5    to public shame, and as he said in his letter, "My destructive

6    actions have caused immense pain for my wife and daughters.  My

7    situation has been and will continue to be publicly humiliating

8    to them.  I will feel the pain that I have caused my family

9    long after others have forgotten my actions."

10            It's hard to imagine the full extent of the

11   personal pain and embarrassment that the defendant experiences

12   each day, but I have some understanding, based upon the letters

13   that I have read, that all point to the fact that he is filled

14   with remorse.

15            I have also considered that the defendant does

16   have medical issues that are described in the presentence

17   report at paragraph 77 through 80 which I have considered but

18   will not discuss out of respect for defendant's privacy.

19            Defendant suffers from depression and anxiety,

20   and as the defendant indicated this morning, he believes that

21   he suffered depression as a child which was never formally

22   treated.

23            Although the defendant had issues from an eye

24   condition which resulted in his placement in special ed

25   classes, defendant earned his high school degree in 1988.  As I

1  mentioned, he attended Scottsdale Community College and

2  Orange Coast College where he studied marketing.  He's always

3  been fully employed and is described in the PSR at

4  paragraphs 90 through 93.  However, he was terminated in

5  January of 2020 from his employment at Oak View Group as a

6  result of his Indictment in this case.

7          The defendant has no criminal record and has been

8  placed in category one.

9          The defendant has accepted responsibility by

10  entering a plea of guilty which I consider to be a very

11  important sentencing factor.  The defendant has expressed

12  remorse in defendant's letter and at sentencing which I find

13  sincere.  In summary, this factor favors a degree of leniency.

14          The Court has also considered and taken into

15  account the advisory guideline range.  The Court finds that the

16  range adequately takes into consideration the specific facts

17  and circumstances of this case and the range established by the

18  guidelines is sufficient to satisfy the purposes of the

19  sentencing under 3553(a)(2).

20          The next factor considered by the Court is

21  unwarranted sentencing disparity.  I did consider this factor

22  and conclude, to the extent any disparity exists, it is not

23  unwarranted and is fully justified by the unique circumstances

24  of this case.

25          Finally, after considering these factors, the

1  statute directs me to impose a sentence sufficient but not

2  greater than necessary to comply with the purposes of

3  sentencing and instructs me to consider the need for the

4  sentence imposed, first, to protect the public from further

5  crimes of the defendant.  I have considered this need, and I am

6  confident the defendant will not commit additional crimes;

7  Second, to provide defendant with needed

8  treatment which is designed to rehabilitate the defendant.  I

9  am also confident there is no such need in this case;

10  Third, to provide adequate deterrence to criminal

11  conduct.  This is an important factor or goal in this case, and

12  I agree with the Government that effectuating general

13  deterrence is important.  A custodial sentence is an important

14  step in restoring the public's confidence in our local

15  government at a time when many people are questioning it.  In

16  addition, a custodial sentence will send a strong message of

17  general deterrence to our elected officials that no person, no

18  matter how powerful, no matter his or her wealth, no matter his

19  or her title is above the law and that there are serious

20  consequences when you decide to violate the law as the

21  defendant has done in this case.

22  Accordingly, the Court must and will send -- and

23  the Court's sentence must and will send the message to those

24  who are considering committing similar crimes that, if they get

25  caught, they will face a prison sentence.

1          Finally, there is a need for retribution which

2     requires the sentence to reflect the seriousness of the

3     offense, promote respect for the law, and to provide just

4     punishment for the offense.  In white collar cases, this need

5     or factor typically stands out as one of the most important and

6     yet the most difficult for the Court to apply.

7          I'm aware that I have dwelled at great length on

8     the nature of the offense and the other factors set forth in

9     3553(a).  However, I have done so fully recognizing that

10    justice is due to this defendant in imposing sentence but also

11    fully recognizing that justice is owed to society for which I

12    am charged with the responsibility to speak in imposing

13    sentence.

14          In my view, there is no more important but

15    difficult duty entrusted to a judge than depriving an

16    individual of his liberty.  It is an enormous responsibility,

17    and I take this responsibility very seriously.  However, there

18    is simply no way I can fashion a sentence that reflects the

19    seriousness of the offense and which would promote respect for

20    the law and provide just punishment without imposing a

21    custodial sentence.  In my judgment, a probationary sentence of

22    the type suggested by defendant's counsel would not promote

23    respect for the law and/or provide just punishment.

24    Accordingly, the following will be the sentence of the Court:

25          It is ordered that the defendant shall pay to the

1   United States a special assessment of $100 which is due

2   immediately.

3               It is ordered that the defendant shall pay to the

4   United States a fine of $15,000 which shall bear interest if

5   provided by law.  The fine shall be paid in full immediately.

6   Payments may be subject to penalties for default and

7   delinquency pursuant to 18 United States Code Section 3612(g).

8               The defendant shall comply with second amended

9   General Order 20-04.

10              Pursuant to the Sentencing Reform Act of 1984, it

11  is the judgment of the Court that the defendant is hereby

12  committed on Count 1 of the Indictment to the custody of the

13  Bureau of Prisons for a term of 14 months.

14              Upon release from imprisonment, the defendant

15  shall be placed on supervised release for a term of three years

16  under the following terms and conditions:

17              One, the defendant shall comply with the rules

18  and regulations of the U.S. Probation Office and Pretrial

19  Services Office and second amended General Order 20-04

20  including the conditions of supervised release set forth in

21  Section 3 of the second amended general order;

22              During the period of community supervision, the

23  defendant shall pay the special assessment and fine in

24  accordance with this judgment's orders pertaining to such

25  payment;

1           Defendant shall cooperate in the collection of a

2    DNA sample;

3           The defendant shall apply all monies received

4    from any income tax refunds, lottery winnings, inheritance,

5    judgment, or any other financial gains to the court-ordered

6    financial obligation.

7           The drug testing condition mandated by statute is

8    suspended based upon the Court's determination that the

9    defendant poses a low risk of substance abuse.

10          I want to advise the defendant that under your

11   plea agreement with the Government you might have waived most

12   of your right to appeal this sentence and your plea agreement

13   will govern this issue.  However, if you retain the right to

14   appeal and you wish to appeal this sentence, you must file a

15   Notice of Appeal within 14 days of today or you will lose your

16   right to an appeal.  If you are unable to afford an attorney

17   for your appeal, one may be appointed to you at no cost.

18          I am also going to order that the defendant shall

19   self-surrender for the service of his sentence at the

20   institution designated by the Bureau of Prisons, and I am going

21   to set that date as June 1st of 2021.

22          MS. LEVINE:  Your Honor, may I be heard?

23          THE COURT:  Wait a minute.

24          In absence of such designation by the Bureau of

25   Prisons, the defendant shall report on or before the same date

1    and time to the U.S. Marshal.

2              I picked the June 1st date as a -- because, given

3    what's going on in the Bureau of Prisons, I think a June 1st

4    date is a realistic date.  However, if it turns out that that

5    is not a realistic date, I will certainly entertain a

6    stipulation setting forth good cause of a continuance of that

7    date.

8              MS. LEVINE:  Thank you, Your Honor.  I was going

9    to ask for more time because of the situation, but if the Court

10   understands that none of us know -- I don't think any of us

11   expected we would be here in late January.  So --

12             THE COURT:  No.  I understand that.  But I'm just

13   going to pick that date.  It's my understanding that apparently

14   they're starting to vaccinate all of the inmates over at the --

15   certainly at the MDC and other institutions.  But I will

16   certainly hear from you if, when we get closer to June -- June

17   1st that there is a reason to continue that date.

18             I also want to indicate that the terms and

19   conditions of the defendant's release shall remain in effect

20   until the defendant reports to the Bureau of Prisons, and then

21   upon his report to the Bureau of Prisons, the -- his bond will

22   be exonerated.

23             Does the Government have a motion as to the

24   remaining counts?

25             MR. JENKINS:  Yes --

1          MS. LEVINE:  Your Honor, may I interrupt for one

2    second again -- I apologize -- and ask the Court to recommend a

3    designation of Lompoc Camp?

4          THE COURT:  Yes.  I will make that

5    recommendation.

6          MR. JENKINS:  In the interest of justice,

7    Your Honor, the Government moves to dismiss all remaining

8    counts against this defendant.

9          THE COURT:  Those remaining counts are what?

10         MR. JENKINS:  Counts 2 through 7.

11         THE COURT:  All right.  That motion will be

12   granted.

13         I think I have covered everything.  Anything else

14   from the defense?

15         MS. LEVINE:  No, Your Honor.

16         THE COURT:  Anything else from the Government?

17         MR. JENKINS:  Just one clarification.  Did the

18   Court impose any hours of community service?

19         THE COURT:  I did not.

20         MR. JENKINS:  Understood.  Thank you, Your Honor.

21   Nothing further.

22         THE COURT:  All right.  Nothing further.  We will

23   close the record.

24              (Proceedings concluded at 10:06 a.m.)

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15              DATED THIS  8TH  DAY OF FEBRUARY, 2021.

16

17

18              /S/ MIRANDA ALGORRI

19              _____
                MIRANDA ALGORRI, CSR NO. 12743, CRR
20              FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25